2012 WY 38

**In the Matter of the Wyoming Worker's Compensation Claim of Michael BEALL # 2, Appellant (Employee/Claimant),**

v.

**SKY BLUE ENTERPRISES, INC., Appellee (Employer/Objector).**

No. S–11–0162.

Supreme Court of Wyoming.

March 14, 2012.

Representing Appellant: Donna D. Domonkos, Domonkos Law Office, Cheyenne, Wyoming.

Representing Appellee: Bradley T. Cave, Maryt L. Fredrickson, and Isaac N. Sutphin, Holland & Hart, LLP, Cheyenne, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Appellant, Michael Beall, received preauthorization from the Wyoming Workers' Safety and Compensation Division for an orchiectomy, a procedure to remove his left testicle, which he claimed was related to a workplace injury. Mr. Beall's employer, Sky Blue Enterprises, Inc., objected to the preauthorization and the matter was referred to the Medical Commission Hearing Panel for a contested case hearing. Mr. Beall elected to undergo the surgery prior to the scheduled hearing. The Commission denied Mr. Beall's claim for reimbursement of medical expenses on the basis that the surgery was not reasonable or necessary medical care resulting from his workplace injury. Mr. Beall appealed to the district court, which affirmed the Commission's order. He challenges that decision in this appeal. We affirm.

## ISSUES

[¶ 2] Mr. Beall presents the following issues:

1. Whether the Medical Commission's decision is arbitrary, capricious, or otherwise not in accordance with the law as a result of the fact that Mr. Beall was

required to bear the burden of proving his claim for reimbursement of medical expenses.

2. Whether the Medical Commission's decision is supported by substantial evidence.

Appellee, Sky Blue, states the issues as follows:

1. Whether placing the burden of proof on the claimant Mr. Beall was in accordance with well-settled law and not arbitrary or capricious.

2. Whether the Medical Commission's decision that Mr. Beall's orchiectomy and associated medical treatment was not reasonable, necessary, nor causally related to his workplace accident of October 13, 2008, and thus was a noncompensable injury, is supported by substantial evidence.

### FACTS

[¶ 3] Mr. Beall was injured on October 13, 2008 when, in the course of connecting a water valve for his employer, Sky Blue, he fell on the valve and struck his groin. The fall was not witnessed by any of his coworkers. Immediately after the incident, Sky Blue's safety coordinator drove Mr. Beall to a doctor's office in Rock Springs. Mr. Beall was examined by a physician's assistant, who noted that Mr. Beall had no swelling or bruising and instructed Mr. Beall to take ibuprofen for the pain. Although Mr. Beall was released to "work as directed," his safety coordinator drove Mr. Beall to his home in Rawlins.

[¶ 4] When Mr. Beall returned to work on October 15, expecting to be assigned light duty, he was instead assigned to an activity involving heavy lifting, which he refused. After leaving work that day, Mr. Beall sought treatment from Dr. Wayne Couch, his primary care provider. A physician's assistant at Dr. Couch's office adjusted Mr. Beall's pain medications and referred him to Central Wyoming Urological Associates in Casper. On October 16, Chad Sundquist, a physician's assistant at the urology clinic, examined Mr. Beall and noted that there

were no abnormalities of Mr. Beall's scrotum, testes, or groin area. Mr. Beall complained of discomfort upon palpation, but no swelling, bruising, or bleeding was indicated. An ultrasound and CT scan were administered on October 22. Results from the ultrasound revealed that

> The testes were homogeneous in echotexture without evidence of testicular laceration or hematoma in this patient status post trauma. Color Doppler flow demonstrated in both the right and left testes. The epididymis was within normal limits bilaterally.
>
> . . .
>
> The patient has bilateral hydroceles without evidence of testicular laceration or hematoma.[1]

Similarly, the CT scan indicated that

> There is no evidence of pelvic fracture or hematoma in this patient who has sustained a "straddle" type injury. There does appear to be a small amount of increased attenuation in the ischiorectal fossa fat which may be secondary to edema from the patient's trauma. There is no focal hematoma present.

At a follow-up visit at the urology clinic on November 10, Mr. Beall was again examined by Mr. Sundquist. In the report from the second examination, Mr. Sundquist reported Mr. Beall's "status" as follows:

> Improved. I am not able to identify any structural urologic abnormalities and [Mr. Beall's] pain is consistent with a body wall strain/connective tissue trauma. I recommend anti-inflammatories, and ice/heat [as needed] and will have patient follow [up] with his [primary care provider] for further consideration/evaluation and treatment. The patient sought my recommendations for how long he should be out of work, [and requested that I] fill out paperwork for short-term total disability. I advised him again that I cannot identify any urologic pathology, which is what I am authorized to see and treat.

[¶ 5] Mr. Beall continued to treat with Dr. Couch, who subsequently referred him to Dr.

---

1. A hydrocele is a fluid-filled sac surrounding a testicle that results in swelling of the scrotum.

Gary Chizever, a gastroenterologist in Rawlins. Dr. Chizever examined Mr. Beall on January 8, 2009, and noted that "The patient demonstrated marked evidence of tenderness even on approach to the scrotal exam, even before any physical contact actually made. He demonstrated this behavior during examination of left groin area as well." With regard to his review of the CT scan from the Casper urology clinic, Dr. Chizever noted the following: "Question of small abnormality in the soft tissue in ischiorectal fossa. No obvious gross lesions to my review." Dr. Chizever ordered a repeat CT scan in order to "follow up on the question raised of an ischiorectal soft tissue abnormality from patient's previous CT." After reviewing the results of the repeat CT scan, Dr. Chizever noted that the "previously identified possible abnormality in the ischiorectal fossa found on CT now appears resolved on follow up study." Dr. Chizever advised Mr. Beall that it was "his and Dr. Couch's option whether a repeat visit to [a] urologist would be of benefit." Dr. Chizever subsequently notified the Division that he felt Mr. Beall could return to work.

[¶ 6] Mr. Beall returned to Dr. Couch and reported that "there is no way I can do my job." Dr. Couch referred Mr. Beall for follow-up urology and neurology consults in Casper. On February 17, Dr. Couch notified the Division that Mr. Beall had been released to return to work. The following day, Mr. Beall's workers' compensation claims representative noted that she received a message from Mr. Beall indicating that he had fired Dr. Couch and had found another doctor.

[¶ 7] On February 17, Mr. Beall saw Dr. David R. Cesko in Rawlins. With regard to his examination of Mr. Beall, Dr. Cesko noted as follows:

At this point, his exam is actually relatively benign. When I just barely touch his inguinal area on the left, he screams out in pain, which I think is somewhat overreacted. I do not think the amount of pain is consistent with the exam. Both of his testicles [ ] are equal. No masses were palpated. No hernia was palpated.

Dr. Cesko referred Mr. Beall to Dr. William D. Flock, a urologist in Laramie. Dr. Flock noted that Mr. Beall's left testicle was extremely tender but that he was "unable to palpate" the problem. In his notes, Dr. Flock indicated the following treatment plan options: "1. Neurology consult[,] 2. Urodynamic[,] 3. ? left orchiectomy." Dr. Cesko subsequently referred Mr. Beall to Dr. Reed Shafer, a neurologist, who conducted a physical examination and provided a complete neurologic study of Mr. Beall. Dr. Shafer determined that there "seems to be no anatomical abnormality demonstrated in terms of the genitalia," and reported that an electrodiagnostic study of Mr. Beall's left lower extremity was a "normal study."

[¶ 8] Mr. Beall then went to see Dr. Richard R. Augspurger, a urologist in Denver, pursuant to a referral by Dr. Flock. Mr. Beall reported that his symptoms were left testicular pain, urinary frequency, and erectile dysfunction. After conducting a physical examination and urodynamic testing, Dr. Augspurger detected no neurologic cause for any of Mr. Beall's symptoms. With regard to Mr. Beall's left testicular pain, Dr. Augspurger noted that "the remaining option would be to do a left orchiectomy as it appears that all conservative methods have been tried."

[¶ 9] In July of 2009, Mr. Beall contacted Dr. Augspurger and indicated that he wanted to proceed with an orchiectomy. Dr. Augspurger subsequently requested preauthorization for the procedure from the Wyoming Workers' Compensation Division, and the Division requested peer reviews from Dr. Jeffrey Balison and Dr. James White. Dr. White stated that "it would be nice to see some abnormalities on the imaging studies, but this is a sensory and a subjective symptom and even though there are no significant findings on imaging studies, the symptoms that this patient is experiencing certainly warrant this approach." The preauthorization report from Dr. Balison, in turn, provided as follows:

There seems little doubt that Mr. Beal[l] sustained a left groin injury while at work on 10/13/08. He sought medical care the day of injury and several times immediately thereafter. Of note, there has not been any reliable physical evidence of injury

other than his self-reported pain which has seemingly become even worse with time, although he has not worked much, if at all, since injury and has relied on narcotic medication for pain management.

The only evident description that is counter to normal physical findings is contained in a letter to the division by Dr. Cesko written 04/02/09 that claims the left testis is spongy and non-functional. This is at odds with three urologists, a general surgeon, and about three other primary care providers. It is thereby discarded as being inaccurate.

More problematic is the linkage of erectile dysfunction to the accident.... Coupled with a normal neurological exam, essentially normal urodynamics and neuromuscular testing as well as ultrasounds and CT scans that are urologically unremarkable, secondary gain and somatization become problematic considerations. Psychological evaluation is advised, particularly since erectile dysfunction may constitute a future potential claim.

Although this patient has had very detailed and generally quite adequate evaluations, I would suggest consideration of the following before orchiectomy.

1. [Testing to rule out diabetes.]

2. [Testing to rule out sarcoidosis.]

3. Request Dr. Augspurger block the inguinal spermatic cord with short-acting local anesthetic (Lidocaine) as well as a concurrent long-acting local (Marcaine). If the patient gets substantial relief, he may be suffering from Chronic Regional Pain Syndrome (CRPS) Type II from a traumatic injury to the genital branch of the left genitofemoral nerve or similarly to the il[i]oinguinal nerve nearby. A simple sensory neurectomy could potentially yield substantial, if not complete, relief and can be completed as an outpatient under local and minimal sedation.

If all the above fails, orchiectomy is the remaining logical choice. Testicular prosthetic implantation would be up to the patient.

. . .

[¶ 10] Based on the reports provided by Drs. Balison and White, the Division issued preauthorization approval for the surgery on August 31, 2009. The approval noted as follows:

Either the injured worker or the employer may object to this determination and request a hearing. Affected parties have a right to a hearing before a hearing examiner as provided by the Wyoming Worker's Compensation Act and to legal representation. The Division must receive a written request for a hearing on or before September 15, 2009. If a timely written request for hearing is not filed with the Division, the final determination by the Division pursuant to W.S. § 27–14–601(k) shall not be subject to further administrative or judicial review.

On September 15, Sky Blue objected to the Division's determination, claiming that (1) Mr. Beall's condition did not meet the definition of "injury" under Wyo. Stat. Ann. § 27–14–102(a)(xi); (2) that there was no evidence that Mr. Beall sustained an injury in the course of his employment with Sky Blue; and (3) that the medical procedures proposed to treat Mr. Beall's condition were not "medically reasonable, necessary or appropriate under the circumstances." The matter was referred to the Medical Commission to determine whether the procedure was "medically reasonable and necessary" as a result of the October 2008 workplace injury. Approximately two weeks after Sky Blue objected to the Division's determination, and one week after the matter was referred to the Medical Commission, Mr. Beall proceeded with the orchiectomy. A post-operative pathology report of the testicle revealed "no grossly evident mass lesions" and indicated that the testicle was functional.

[¶ 11] The contested case hearing was held on July 22, 2010. The Commission heard testimony from Mr. Beall and was presented with extensive medical records from each of his treatment providers, as well as deposition testimony from Dr. Augspurger. After considering all of the evidence, the Commission concluded that "the orchiectomy procedure was not reasonable and necessary medical care as related to the October

13, 2008, work injury." The Commission also determined that

> Mr. Beall has not established a causal connection between the orchiectomy procedure and the work injury of October 13, 2008, and benefits related thereto are therefore found to be non-compensable. Mr. Beall, at most, sustained a minor injury to his ischiorectal/scrotal area, which was fully resolved by the time he saw Dr. Chizever on February 11, 2009.

The district court affirmed the Medical Commission's decision. Mr. Beall appealed the district court's decision to this Court.

## STANDARD OF REVIEW

 [¶ 12] Review of an administrative agency's action is governed by the Wyoming Administrative Procedure Act, which provides that:

> (c) To the extent necessary to make a , decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> . . .
>
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
>
>> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
>>
>> (B) Contrary to constitutional right, power, privilege or immunity;
>>
>> (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
>>
>> (D) Without observance of procedure required by law; or
>>
>> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2009). We review an administrative agency's findings of fact pursuant to the substantial evidence test. *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008). Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.,* ¶ 11, 188 P.3d at 558. Findings of fact are supported by substantial evidence if, from the evidence in the record, this Court can discern a rational premise for the agency's findings. *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2011 WY 118, ¶ 11, 259 P.3d 1161, 1164 (Wyo.2011).

 [¶ 13] The arbitrary and capricious standard of review is used as a "safety net" to catch agency action which prejudices a party's substantial rights or which may be contrary to the other review standards under the Administrative Procedure Act, yet is not easily categorized or fit to any one particular standard. *Dale,* ¶ 23, 188 P.3d at 561. The arbitrary and capricious standard applies if the agency failed to admit testimony or other evidence that was clearly admissible, or failed to provide appropriate findings of fact or conclusions of law. *Id.* We review an agency's conclusions of law *de novo. Id.,* ¶ 26, 188 P.3d at 561–62.

## DISCUSSION

### Burden of Proof

 [¶ 14] A claimant in a workers' compensation case generally has the burden of proving each of the essential elements of the claim by a preponderance of the evidence. *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2011 WY 14, ¶ 22, 247 P.3d 845, 851 (Wyo.2011). In this case, however, Mr. Beall contends that the Medical Commission improperly assigned to him the burden of proving his claim for reimbursement of medical expenses. Citing our recent decision in *Lane–Walter v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2011 WY 52, 250 P.3d 513 (Wyo.2011), Mr. Beall claims that the Division's preauthorization for the orchiectomy established a presumption that he was entitled to reimbursement for his medical expenses, and that the burden shifted to his employer to prove that the procedure was

not reasonable or necessary treatment related to his workplace injury. He further contends that placing the burden of proof on his employer "is also consistent with the law of placing the burden on the party who asserts the affirmative of any issue."

[¶ 15] We note initially that, at the contested case hearing, Mr. Beall did not claim that the Commission improperly allocated the burden of proof. Rather, Mr. Beall's counsel expressly acknowledged that Mr. Beall had the burden of proving that he was entitled to reimbursement for his medical expenses:

> We believe the evidence will also show that the surgery Mr. Beall submitted to was appropriate and necessary. We believe the evidence will meet Mr. Beall's burden of proof. And at the end of the testimony, we will respectfully ask the Medical Commission to find that Mr. Beall has met his burden and that preauthorization for the surgery was appropriate and that the resulting surgery and medical care was necessary and appropriate.

Generally, we do not consider issues on appeal that have not been raised in an administrative action. *Watkins v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 49, ¶ 22, 250 P.3d 1082, 1089 (Wyo.2011).

> We have recognized in more than a few decisions ... that orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts.

*Id.* (quoting *Wyoming Bancorporation v. Bonham*, 527 P.2d 432, 439 (Wyo.1974)). In Mr. Beall's case, however, he was prompted to raise an issue as to proper allocation of the burden of proof by our decision in *Lane–Walter*, which was issued after the Commission's order denying benefits but before Mr. Beall's appeal reached this Court.[2] In *Lane–Walter*, although the claimant had not previously raised the issue, we indicated that, under the unusual circumstances of that case, the Division should have the burden of prov-

ing the claimant's treatment was not reasonable or necessary. In order to dispel any notion that Mr. Beall was merely a victim of timing, we will proceed to evaluate the merits of Mr. Beall's assertion that he should not have the burden of proving his claim for reimbursement of medical expenses.

[¶ 16] The Division's decision to preauthorize medical care is governed by Wyo. Stat. Ann. § 27–14–601(*o*), which provides as follows:

> (*o*) The division pursuant to its rules and regulations may issue a determination of preauthorization for an injured worker's nonemergency hospitalization, surgery or other specific medical care, subject to the following:
>
> (i) The division's determination that the worker suffered a compensable injury is final and not currently subject to contested case or judicial review;
>
> (ii) A claim for preauthorization is filed by a health care provider on behalf of the injured worker;
>
> (iii) ***The division's determination pursuant to this subsection is issued in accordance with the procedures provided in subsection (k) of this section;***
>
> (iv) Following a final determination to preauthorize, the necessity of the hospitalization, surgery or specific medical care shall not be subject to further review and providers' bills shall be reviewed only for relatedness to the preauthorized care and reasonableness in accord with the division's fee schedules.

(Emphasis added.) Subsection (k), in turn, provides in relevant part that

> (k) Determinations by the division pursuant to this section and W.S. 27–14–605 shall be in accordance with the following:
>
> (i) The initial review of entitlement to benefits pursuant to subsections (a) and (e) of this section shall be made by the division within fifteen (15) days after the date the injury report or claim is filed. Following initial review, the division

---

**2.** Two weeks after the district court issued its decision affirming the Medical Commission's order, Mr. Beall, relying on the decision in *Lane–* *Walter*, filed a petition requesting the court to relieve him from the judgment. The district court denied the petition.

shall issue a final determination or if a final determination cannot be made based upon available information at that time, the division may issue a request for additional information as necessary;

. . .

(iv) *Any interested party may request a hearing before a hearing examiner on the final determination of the division by filing a written request for hearing with the division within fifteen (15) days after the date the notice of the final determination was mailed by the division.*

. . .

(vi) If timely written request for hearing is not filed, the final determination by the division pursuant to this subsection shall not be subject to further administrative or judicial review, provided however that, in its own discretion, the division may, whenever benefits have been denied to a worker, make a redetermination within one (1) year after the date of an original determination regardless of whether or not a party has filed a timely appeal pursuant to paragraph (iv) of this subsection.

(Emphasis added.) In providing that preauthorization for an injured worker's medical care is subject to the procedures in subsection (k), the statute preserves the ability of an employer or other interested party to request a hearing on the preauthorization decision, as occurred in the present case.

[¶ 17] Additionally, Wyo. Stat. Ann. § 27–14–606 provides that no determinations are final under the Worker's Compensation Act without notice and an opportunity for a hearing:

Each determination or award within the meaning of this act is an administrative determination of the rights of the employer, the employee and the disposition of money within the worker's compensation account as to all matters involved. No determination shall be final without notice and opportunity for hearing as required by this act.

In *Martinez v. State ex rel. Wyoming Workers' Comp. Div.*, 917 P.2d 619 (Wyo.1996), we analyzed this statute in the context of a dispute involving an employer's claim for reimbursement of benefits received by an injured worker, as well as that worker's claims for further benefits relating to the same injury. The hearing examiner concluded that the employer did not meet its burden of proving that the employee's benefits should be terminated and, as a result, awarded benefits to the employee on his outstanding claims and denied the employer's request for a modification of the benefits which had already been paid. *Id.*, 917 P.2d at 620. On appeal, the district court reversed the hearing examiner's decision with respect to the employee's outstanding claims, reasoning that the employee had the burden of proving that he was entitled to receive compensation for those claims. *Id.*, 917 P.2d at 620–21. In upholding the district court's decision, we cited Wyo. Stat. Ann. § 27–14–606, and, quoting from a prior decision, noted that "the employer is entitled to dispute any award or claim on the basis that it is unreasonable or improper, and certainly can raise the question as to whether the award or claim is causally related to the industrial accident which occurred or whether it may be attributable to some other event." *Id.*, 917 P.2d at 621 (quoting *Herring v. Welltech, Inc.*, 660 P.2d 361, 366 (Wyo.1983)). We concluded as follows:

From the clear language of § 27–14–606 and this Court's decisions which have interpreted the statute, it is obvious that the normal process for an employer's objection applied to the employee's outstanding claims. It follows, then, that the employee bore the usual burden of proving that he was entitled to receive benefits for his outstanding claims. To place the burden of proof on the employer to dispute an employee's right to receive benefits on any further claims after the employee's first claim has been approved would effectively nullify the provisions of § 27–14–606.

*Martinez*, 917 P.2d at 621. *See also Johnson v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 166, 244 P.3d 491 (Wyo.2010).

[¶ 18] Although *Martinez* is distinguishable based on the fact that there was no

decision to preauthorize medical treatment in that case, we find that the statutes mandate the same result. Wyo. Stat. Ann. § 27–14–601(k)(iv) and Wyo. Stat. Ann. § 27–14–606 each preserve an employer's ability to object to a determination to preauthorize treatment. Further, Wyo. Stat. Ann. § 27–14–601 does not set forth any evidentiary presumptions arising from preauthorization that would support an injured worker's claim for benefits or shift the burden of proof. Accordingly, there is no indication in the statute that the burden shifts to the party objecting to preauthorization to disprove any elements of an injured worker's claim. Despite the Division's grant of preauthorization for Mr. Beall's orchiectomy, the burden remained with Mr. Beall to prove that he was entitled to reimbursement for his medical expenses.

[¶ 19] Our decision in *Lane–Walter* does not require a different result. In that case, the claimant entered into a settlement agreement with the Workers' Safety and Compensation Division in 1997 requiring the Division to pay for medical expenses related to the claimant's back injury. *Lane–Walter*, ¶ 5, 250 P.3d at 515. In 2007, the claimant sought preauthorization for a surgical procedure but was informed by the Division that no preauthorization for the procedure was required. *Id.*, ¶¶ 8–9, 250 P.3d at 516. The claimant proceeded with the surgery without objection from the Division or the claimant's employer. *Id.* After the surgery, the Division denied benefits on the basis that the procedure was not reasonable or necessary. *Id.*, ¶ 1, 250 P.3d at 514. The matter was referred to the Medical Commission, which upheld the Division's denial of benefits. *Id.* In reversing the district court's decision upholding the Medical Commission's denial of benefits, we indicated that under the unusual circumstances presented, the burden should have shifted to the Division to prove that the claimant's procedure was not reasonable and not medically necessary. *Id.*, ¶ 18, 250 P.3d at 519. Ultimately, however, we reversed the Medical Commission's decision because it was not supported by substantial evidence. We concluded that

> To the extent that Lane–Walter had a burden of proof in this case, we hold: There is not substantial evidence to sup-

port the agency's decision to reject the evidence offered by Lane–Walter. We reach that decision by considering whether the Medical Commission's conclusions were contrary to the overwhelming weight of the evidence in the record as a whole. The Medical Commission's determinations that both Dr. Horne and Lane–Walter were not credible witnesses are not supported by substantial evidence, i.e., there is not relevant evidence in the record which a reasonable mind might accept in support of the Medical Commission's conclusions. The order of the district court affirming the Medical Commission is reversed.

*Id.*, ¶ 22, 250 P.3d at 520.

[¶ 20] The present case is distinguishable from *Lane–Walter*. In this case, the Division never gave any indication to Mr. Beall that preauthorization for the orchiectomy was not required, but rather followed the relevant statutory procedures by providing notice of preauthorization to Mr. Beall's employer. Mr. Beall's employer objected to the preauthorization within the period set by Wyo. Stat. Ann. § 27–14–601(k). Further, there was no settlement agreement in this case stipulating that Mr. Beall experienced a workplace injury or that his employer would pay for medical treatments related to that injury. In light of these facts, we find that our decision in *Lane–Walter* does not require shifting of the burden of proof in this case. The burden remained with Mr. Beall to prove all elements of his claim. *See, e.g., Kenyon*, ¶ 22, 247 P.3d at 851.

### *Substantial Evidence*

[¶ 21] The Wyoming Worker's Compensation Act provides benefits for work-related injuries. An "injury" is defined by the Act as follows:

> "Injury" means any harmful change in the human organism other than normal aging and includes damage to or loss of any artificial replacement and death, arising out of and in the course of employment while at work in or about the premises occupied, used or controlled by the employer and incurred while at work in places where the employer's business requires an

employee's presence and which subjects the employee to extrahazardous duties incident to the business.

Wyo. Stat. Ann. § 27–14–102(a)(xi). Consistent with the phrase "arising out of and in the course of employment," we have explained that there must be "a causal nexus between the injury and some condition, activity, environment or requirement of the employment." *Shelest v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 3, ¶ 8, 222 P.3d 167, 170 (Wyo.2010) (emphasis omitted).

[¶ 22] One of the benefits provided by the Worker's Compensation Act is payment of medical expenses for work-related injuries. "The expense of medical and hospital care of an injured employee shall be paid from the date of the compensable injury. . . ." Wyo. Stat. Ann. § 27–14–401(a). As indicated in the definition of "medical and hospital care," however, medical care must be reasonable and necessary in order for an expense to be covered by the Act: " 'Medical and hospital care' when provided by a health care provider means any reasonable and necessary first aid, medical, surgical or hospital service. . . ." Wyo. Stat. Ann. § 27–14–102(a)(xii). The Rules and Regulations of the Workers' Compensation Division provide further guidance as to the meaning of the phrase "medically necessary": " 'Medically necessary treatment' means those health services for a compensable injury that are reasonable and necessary for the diagnosis and cure or significant relief of a condition consistent with any applicable treatment parameter." Rules, Regulations and Fee Schedules of the Wyoming Workers' Safety and Compensation Division, Ch. 1, § 4(al).

[¶ 23] In this case, Mr. Beall was required to establish that the orchiectomy was reasonable and necessary medical treatment related to his workplace injury. The Medical Commission, in its Findings of Fact, Conclusions of Law, and Order, determined that Mr. Beall's orchiectomy was not reasonable and necessary:

This Panel finds and concludes that the orchiectomy procedure was not reasonable and necessary medical care as related to the October 13, 2008, work injury. If Mr.

Beall suffered an injury by slipping and falling at work on October 13, 2008, it was a minor injury to his groin, as revealed by slightly enlarged hydroceles and a small amount of, ". . . increased attenuation in the ischiorectal fossa fat which may be related to this patient's trauma and a small amount of edema in the region. . . ." (CAT scan of October 22, 2008), as indicated in his initial urologic workup. (Employer/Objector Exhibit 3–5). There are absolutely no objective medical findings of injury to the testicle indicated in examinations that occurred shortly after the incident. . . . Mr. Beall may have suffered a slight trauma to the scrotal area, as indicated by hydroceles and the slight swelling of the ischiorectal fossa fat, but that condition had fully resolved by the time he saw Dr. Chizever on February 11, 2009, at which time Dr. Chizever noted that the ". . . previously identified possible abnormality in the ischiorectal fossa found on CT now appears resolved on follow up study." (Employer/Objector Exhibit 5–3).

In accordance with the finding that Mr. Beall's injury had fully resolved by the time he saw Dr. Chizever on February 11, 2009, the Medical Commission concluded that "all care and treatment after that date, including the orchiectomy surgery, is not related to the work injury of October 13, 2008, and is therefore found to be non-compensable."

[¶ 24] Mr. Beall claims that the Commission's determination that the orchiectomy was not related to his work injury is not supported by substantial evidence. He contends, first, that because he was the only witness to the accident, his testimony alone is sufficient to prove that he sustained a workplace injury. Second, he asserts that his pain was inherently subjective and that he was the only person who could testify about the pain he experienced as a result of his injury. With respect to this argument, Mr. Beall ascribes great evidentiary significance to the fact that he voluntarily chose to undergo the orchiectomy, suggesting that his election to proceed with the removal of his testicle leads inexorably to the conclusion that the procedure was medically necessary. Third, Mr. Beall claims that the Commission's ad-

verse credibility determinations were based on an incorrect and biased examination of the evidence.

[¶ 25] To a large extent, Mr. Beall's first two claims do not address the question presented under our standard of review. The assertions that Mr. Beall's testimony was sufficient to prove his injury and that the subjective nature of his pain established that the orchiectomy was reasonable and necessary do not constitute direct challenges to the evidentiary grounds for the Commission's decision. Mr. Beall essentially asks this Court to reweigh the evidence and suggests that we ignore evidence supporting the Commission's findings. As we have previously noted, however, our task "is not to re-weigh the evidence presented to the Commission but only to determine if substantial evidence exists to support its conclusion." *Watkins*, ¶ 25, 250 P.3d at 1091. When we consider Mr. Beall's claims in accordance with the parameters of the substantial evidence test, we must conclude that the Commission's finding that Mr. Beall's orchiectomy was not related to his workplace injury is supported by substantial evidence.

[¶ 26] The key finding of the Commission in this case was that Mr. Beall's workplace injury had resolved by the time of his visit to Dr. Chizever, over seven months prior to the orchiectomy. This conclusion finds ample support in the record. Dr. Chizever's notes from Mr. Beall's January 8, 2009 appointment indicate no abnormalities relating to Mr. Beall's testicles: "Urologic exam is normal.... Testes descended bilaterally. No gross evidence of hydrocele nor scrotal masses (see ultrasound report)." Dr. Chizever noted only the possibility of an abnormality with respect to Mr. Beall's ischiorectal fossa based on the CT scan at Central Wyoming Urological Associates on October 22: "Scrotal Ultrasound done October 22, report reviews suggesting bilateral small hydroceles. No ischemia. No masses. CT of the pelvis from October 22 films and report reviewed. Question of small abnormality in the soft tissue in ischiorectal fossa. No obvious gross lesions to my review." On February 11, 2009, after a follow-up CT scan, Dr. Chizever noted that the possible abnormality in the ischiorectal fossa appeared to be resolved. No abnormalities regarding Mr. Beall's testicles were noted. After Mr. Beall's examination, Dr. Chizever and Dr. Couch each notified the Division that Mr. Beall had been released to return to work.

[¶ 27] Further, the treatment providers who examined Mr. Beall during the hours and days immediately following his injury also could not identify any abnormalities in Mr. Beall's testicles. The physician's assistant who examined Mr. Beall in Rock Springs immediately after the incident found no objective indications of injury: "no swelling[,] no bruising[,] no mass[,] has some point tenderness to the inguinal and cord." Likewise, notes from the examination at Rawlins Urgent Care two days after the incident reveal only that there was "no blood in [Mr. Beall's] urine." Subsequent reports from Mr. Beall's physical examinations at Central Wyoming Urological Associates, and the results from his ultrasound and CT scan, also did not reveal objective signs of testicular trauma. In Mr. Sundquist's report of the physical examination conducted on Mr. Beall's first visit to Central Wyoming Urological Associates, he noted the following:

SCROTUM: Scrotum is normal in appearance with no cysts, rashes, abnormal pigmentations, or lesions. No ecchymoses. Normal exam, but significant patient discomfort to palpation of the scrotum, scrotal contents and inguinal areas (L > R).

TESTES: Testes are palpable in the scrotum and normal in size, symmetry and texture.

EPIDIDYMIDES: Bilateral epididymides are palpable, posterolateral in position, of normal size and symmetry. No palpable mass.

VAS DEFERENS: Left and right are normal.

Consistent with these notations, the findings from the scrotal ultrasound ordered by Central Wyoming Urological Associates indicated that "The testes were homogeneous in echotexture without evidence of testicular laceration or hematoma in this patient status post trauma. Color Doppler flow demonstrated in

both the right and left testes.[3] The epididymis was within normal limits bilaterally." Similarly, the findings from the pelvic CT scan indicated no abnormalities in Mr. Beall's pelvic region aside from the "small amount of increased attenuation in the ischiorectal fossa fat," which was resolved in a follow-up study as noted above. This evidence provides substantial support for the Commission's findings.

[¶ 28] We are also not persuaded by Mr. Beall's challenges to the Commission's findings with respect to his credibility. As we recently reiterated, the fact finder is entitled to make assessments as to witness credibility and we are reluctant to overturn those judgments on appeal:

"Credibility determinations are the unique province of the hearing examiner, and we eschew re-weighing those conclusions." *Hamilton v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2001 WY 20, ¶ 11, 18 P.3d 637, 640 (Wyo.2001). "We defer to the agency's determination of witness credibility unless it is clearly contrary to the overwhelming weight of the evidence." *Glaze v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 102, ¶ 29, 214 P.3d 228, 235 (Wyo.2009). "If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test." *Dale*, 2008 WY 84, ¶ 22, 188 P.3d at 561; *see also Chavez v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 46, ¶ 18, 204 P.3d 967, 971 (Wyo.2009).

*Watkins*, ¶ 23, 250 P.3d at 1090. We note that, in this case, Mr. Beall's credibility was essential to his claim for reimbursement of his medical expenses given the lack of objective medical findings with respect to his injury, and the fact that he received treatment based solely on his subjective reports of pain.

[¶ 29] Mr. Beall attacks three specific findings of the Commission which he asserts are not supported by the evidence. First, based on the following paragraph from the Commission's findings of fact, Mr. Beall claims that the Commission incorrectly concluded that statements made in his injury report, which indicated that he was told to go back to work after the incident, were inconsistent with his testimony at the contested case hearing:

The fall itself was apparently not witnessed by any other party, and Mr. Beall testified at the Evidentiary Hearing and in spite of the injury report, in which Mr. Beall indicated that he was, ". . . told to go back to work . . .", [ ] that [his foreman] told him to see [the safety coordinator]. Mr. Beall testified that [the safety coordinator] gave him some ibuprofen and a big bag of ice to put on his crotch area and then drove him to the doctor in Rock Springs, Wyoming, which is about one hour from the work site where the injury occurred.

Mr. Beall asserts that there is no inconsistency between his injury report and his testimony at the evidentiary hearing because he had been told to go back to work by the time he completed the injury report, several days after he was injured. In light of this explanation of the evidence, Mr. Beall concludes that "the Commission appears to be, once again, viewing the evidence in a light most likely to result in a denial of benefits."

[¶ 30] Second, Mr. Beall claims that the Commission improperly translated Dr. Augspurger's testimony that a person "may" see swelling after traumatic injury to the testicle into the statement that a person would "expect" to see swelling. He points to the following findings of fact:

Dr. Augspurger also confirmed that Mr. Beall's testicle pain could be caused by a variety of conditions, and many of his patients, ". . . have testicular pain and we never find the exact etiology." (Employer/Objector's Exhibit 15–8, Augspurger Deposition Transcript page 8). Dr. Augspurger also indicated that if there was trauma to the testicle causing pain, one would expect to see, ". . . swelling of the

indicated good blood flow to the testicles.

---

3. Dr. Augspurger stated in his deposition that the Doppler flow shown on the scrotal ultrasound

testicle. Their scrotum may have changed colors, become black and blue from bleeding into the scrotum." (Employer/Objector's Exhibit 15–9, Augspurger Deposition Transcript page 9).

Dr. Augspurger's testimony, as it appears in the deposition transcript, stated as follows:

Q: Okay. So what would you look for in a patient who you believe has suffered trauma resulting [in] testicular pain? What sort of objective findings would you expect to see in a patient like that?

A: If you saw them acutely [within the first week or so after the injury], they may have an injury to the testicle with swelling of the testicle. Their scrotum may have changed colors, become black and blue from bleeding into the scrotum.

[¶ 31] Third, Mr. Beall claims that the Commission improperly discredited his testimony that he was screaming and vomiting after the incident because none of his coworkers observed him do these things and because the physician's assistant who examined him in Rock Springs did not indicate that he had been vomiting. Mr. Beall contends that the Medical Commission could not properly rely on his coworkers' statements because they were not subject to cross-examination. He asserts that "While these types of hearsay statements are admissible as evidence in an administrative hearing, the lack of information in these incident reports is not conclusive evidence that an event did not occur." He also claims that any inconsistencies in his testimony "were not of the nature or magnitude" to overcome the conclusion that his surgery was medically necessary.

[¶ 32] We find no merit in Mr. Beall's assertions. Even if we accepted his claims without qualification, we could not conclude that the Commission's credibility findings are not supported by substantial evidence. The findings identified by Mr. Beall, to the extent that they actually reflect the Commission's doubts about Mr. Beall's credibility, constitute a negligible portion of the Commission's credibility findings, and are extraneous to the central issues identified by the Commission. Mr. Beall does not squarely contest the Medical Commission's principle credibility determinations, which

were focused primarily on three distinct areas of concern: (1) Mr. Beall's failure to provide accurate or complete medical information relating to his injury to a succession of doctors and physicians' assistants; (2) Mr. Beall's failure to provide any of his treatment providers with information relating to a prior groin injury from which he experienced similar symptoms; and (3) Mr. Beall's demeanor and testimony at the contested case hearing.

[¶ 33] The Commission found that Mr. Beall's credibility was undermined by his failure to provide accurate or complete medical histories regarding his treatment to a series of health care providers. The Commission noted that Mr. Beall had provided incomplete medical information to Dr. Flock ("[T]here is no indication that any medical records from the prior medical consults had been provided to Dr. Flock for his review, including the prior urologic workup in Casper."), Dr. Cesko ("Mr. Beall failed to advise Dr. Cesko that he had already been through a full urological workup with Central Wyoming Urological Associates, P.C., and that [their] findings upon examination, were unremarkable."), and Dr. Shafer ("This Panel notes that Dr. Shafer was not provided the medical records of Dr. Couch, Dr. Cesko, or Dr. Flock, and relied exclusively on the subjective reporting of Mr. Beall, which was inaccurate and incomplete."). The Commission also found that Mr. Beall had provided misleading information to Dr. Augspurger. It noted that Dr. Augspurger's initial report from his examination of Mr. Beall stated that Mr. Beall had "significant swelling of his left testicle" at the time of injury, and that "[t]he testicle got a large size and now that has slowly resolved." The Commission found, however, that there was no indication that Mr. Beall experienced any swelling relating to his injury:

This Panel notes that the initial workups that were provided by the Hunter Family Medical Clinic in Rock Springs, Wyoming, Rawlins Urgent Care in Rawlins, Wyoming, and Central Wyoming Urological Associates, P.C., in Casper, Wyoming, did not indicate a swollen testicle in any of their medical records regarding Mr. Beall's examinations.

**1036**

After further noting that Dr. Augspurger's deposition revealed that he had relied entirely on Mr. Beall's report of a traumatic injury to his groin, the Commission concluded as follows:

> As with the other physicians who provided treatment to Mr. Beall, Dr. Augspurger was provided an incorrect and incomplete medical history. Significantly, several prior evaluations, including neurologic evaluations and ultrasounds, were not provided to Dr. Augspurger. Mr. Beall has exhibited a pattern of repeatedly providing inaccurate, incomplete or pointedly misleading medical information to his treating physicians, including Dr. Augspurger. Dr. Augspurger and the other physicians relied upon those inaccuracies in providing medical care to Mr. Beall, including the left testicle removal, which was pursuant to Mr. Beall's request. It is noteworthy that the pathology report of the removed testicle basically shows a normal testicle that was functional.

Importantly, the Commission ultimately concluded that the inaccurate and incomplete medical histories supplied to Mr. Beall's treatment providers, and the medical opinions generated from that misinformation, contributed to the decision to preauthorize the orchiectomy:

> The treating and Peer Review physicians were also misled and misinformed by Mr. Beall and the medical opinions that were generated from the inaccurate and misleading information cannot be considered credible in light of the magnitude of the misrepresentations made by Mr. Beall, although they provide a basis for understanding why Drs. Balison and White, and ultimately the Division, approved the surgical removal of Mr. Beall's left testicle.

Mr. Beall does not challenge any of the Commission's findings that his treatment providers were supplied with incomplete and inaccurate information.

[¶ 34] The Medical Commission's order further indicates that it was troubled by the fact that Mr. Beall had not informed his treatment providers that he had previously experienced problems very similar to those that he claimed arose from his injury. The Commission stated that

> 15. Mr. Beall apparently had very similar problems in the past that resulted in a California Workers' Compensation claim that allegedly took place on December 21, 1991, where he was evaluated at the Emergency Room of the Barstow Community Hospital in Barstow, California, with complaints of, "... pain in right lower quadrant into right testis ...", and later for, "... right groin pain, bladder dysfunction and sexual difficulties...." (Employer/Objector Exhibits 13–1 and 13–3). In 1992, Mr. Beall was provided a variety of evaluations, including a Doppler penile blood flow examination, and in 1993, the notes reflect that a Hearing was held that apparently resulted in a ruling that Mr. Beall did not sustain a compensable injury on December 21, 1991. (Employer/Objector's Exhibit 13–3 and 13–4).
>
> In addition, submitted records indicate that in November of 2000, Mr. Beall apparently had additional problems with "dysuria and frequency ..." and a reference was made of a, "... right inguinal surgery in 1997...." (Employer/Objector's Exhibit 13–7 and 13–8). It is of note that Mr. Beall failed to advise *any* of his Wyoming health care providers of these prior problems and he indicated on page 1 of his *Wyoming Report of Injury,* (Employee/Claimant's Exhibit 1–1), that the body part had not been injured previously.
>
> Mr. Beall also failed to disclose that he had any prior urologic problems in written answers to interrogatory questions that had been submitted by the Employer/Objector. In response to a question about whether he had ever had any care and treatment to his "... genitalia, your reproductive system, or your urologic system ...," Mr. Beall indicated only that [he had been treated for two other unrelated medical conditions]. (Employer/Objector's Exhibit 12–6).

(Emphasis in original.) The Commission concluded that Mr. Beall's subjective reports of his current injury were not credible based, in part, on the fact that "Mr. Beall failed to advise ANY of his treating physicians that he

had prior testicular problems pursuant to a work injury in California, which also included components of urinary incontinence, erectile dysfunction, and objective pain and hernia."

[¶ 35] Mr. Beall does not challenge these findings. Rather, noting that the previous injury was to his right testicle, he contends that "Whether the medical records before the accident were incomplete and whether the doctors had that information in determining the necessity of the surgery is not relevant. This Court has to merely ask itself if ANY man would be willing to have his left testicle removed, if it were not medically necessary." (Footnote omitted.) We have previously noted, however, that "As the trier of fact, the Medical Commission [is] charged with determining relevancy, assigning probative values and weighing the evidence." *McIntosh v. State ex rel. Wyo. Med. Comm'n*, 2007 WY 108, ¶ 13, 162 P.3d 483, 488–89 (Wyo.2007). The Commission concluded that Mr. Beall's prior injuries to his groin were relevant to his October 13, 2008 injury and we do not second-guess that conclusion in this appeal.

[¶ 36] The Commission also determined that Mr. Beall was not a credible witness based on his testimony at the contested case hearing. The Commission noted that although Mr. Beall's medical records clearly indicated that he had undergone a physical examination at the Casper urology clinic on two separate occasions, Mr. Beall denied that such examinations had occurred:

> Mr. Beall testified during the hearing that [physician's assistant] Sundquist, "... did not have me open up my britches or anything ...", during the examination. (Beall Hearing Testimony). However, page 2 of the medical report from Mr. Beall's October 16, 2008, examination by [physician's assistant] Sundquist indicates [visual and palpable observations relating to Mr. Beall's phallus, meatus, scrotum, testes, epididymides, and vas deferens]. (Employer/Objector's Exhibit 3–2 and 3–3).
>
> ...
>
> This Medical Panel finds that Mr. Beall's statement that he was not physically examined by Central Wyoming Urological Asso-

ciates, P.C., is not supported by the medical records, and is not credible.

...

8. Mr. Beall returned for a follow-up visit with [physician's assistant] Sundquist on November 10, 2008, where he advised [physician's assistant] Sundquist that his, "... symptoms have not significantly changed...." (Employer/Objector's Exhibit 3–6). Once again, the records reflect that Mr. Beall was given a physical examination, which on this date included a rectal and prostate examination. During his hearing testimony Mr. Beall again denied that he was given a physical examination and he indicated that:

> [T]hey still didn't pull down my britches or anything like that. They didn't do any type of examination to speak of. (Beall Hearing Testimony).

Mr. Beall also indicated that no one read the x-rays, that had been taken, but they only looked at the narrative report on the front.

The Commission provided the following summary of Mr. Beall's misstatements regarding the reports and opinions of his treatment providers:

26. During his testimony at the Evidentiary Hearing, this Panel did not find Mr. Beall to be a credible witness. Mr. Beall insisted that he was never physically examined at the urological examination in Casper, although the medical records very clearly indicate that a physical examination occurred. We find it highly unlikely that a urologic workup would be conducted by these medical providers without a physical examination of Mr. Beall's testicles and scrotum and the submitted records indicate an examination was provided. He also indicated that Dr. Flock, the urologist in Laramie, said his testicle was "... really damaged ..." and was a "... nonfunctional organ ...", although Dr. Flock's records make no mention of a nonfunctioning organ. Mr. Beall further testified that Dr. Augspurger examined him and "... saw how squishy the testicle was ...", but Dr. Augspurger's records do not reflect such a finding.

In addition, Mr. Beall testified that he never told Dr. Chizever that he had developed hematuria and had been prescribed a course of oral antibiotics for his condition, although Dr. Chizever's records clearly reflect that he did. Mr. Beall also again denied that he was physically examined at his initial visit with Dr. Chizever, although the chart note clearly indicates that a thorough physical examination, including examination of the scrotal area, was carried out.

In addition, the Commission noted that Mr. Beall's demeanor at the contested case hearing also reflected poorly on his credibility:

This Panel also notes that Mr. Beall was elusive and upon cross-examination, failed to answer direct questions with direct answers. The following exchange is representative of Mr. Beall's testimony:

Q: [Dr. Augspurger] didn't say, gee, your testicle is mushy. He didn't say that, did he?

A: He didn't say it, no he didn't—I believe he said that, yeah. I believe he said that it was mushy and kind of weird. (Beall Hearing Testimony).

Again, this Panel notes that Dr. Augspurger's medical records make no mention of a testicle that is either "mushy" or "weird".

Mr. Beall does not address the Commission's findings with respect to his demeanor at the contested case hearing.

[¶ 37] Finally, Mr. Beall does not address the Commission's adverse credibility findings with respect to Dr. Cesko. As we have previously noted, "a hearing examiner is entitled to disregard an expert opinion if he finds the opinion unreasonable, not adequately supported by the facts upon which the opinion is based, or based upon an incomplete and inaccurate medical history provided by the claimant." *Taylor v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 148, ¶ 15, 123 P.3d 143, 148 (Wyo.2005). After quoting a March 27, 2009 letter from Dr. Cesko to the Division which stated that Mr. Beall's "left testicle has been turned into a spongy nonfunctional organ," the Commission noted that Dr. Cesko's conclusions were not supported by the evidence:

It is noteworthy that Dr. Cesko indicates that Mr. Beall's left testicle has been turned into a, "... **spongy nonfunctional organ** ...", with "... **pudendal nerve damage**...." Clearly, none of the initial examinations, including the urological examinations in Casper, revealed a "spongy nonfunctional organ". Dr. Cesko stated in his deposition testimony that he believed he received that specific information from Dr. Flock, the Urologist in Laramie, Wyoming, who saw Mr. Beall at the Memorial Hospital of Carbon County on March 4, 2009. However, a review of Dr. Flock's records that were submitted clearly indicates that no such representation of a "spongy nonfunctional organ" was ever indicated by him. Dr. Cesko also stated during his deposition that he had not reviewed any of the prior medical records from Central Wyoming Urological Associates, P.C., of Casper, Wyoming, nor had he seen the initial reports of treatment provided by Hunter Family Medical Clinic out of Rock Springs, Wyoming.

Dr. Cesko also makes a rather amazing representation that:

It is apparent that he did suffer pudendal nerve damage from the straddle injury. (Employer/Objector's Exhibit 6–1).

A review of Dr. Cesko's notes clearly indicate no objective findings of neurological damage, and a neurological workup that was provided by Reed Shafer, M.D., a Board Certified Neurologist, and Electrodiagnostic Physician with CMS (Cheyenne Medical Specialists, P.C.) in Cheyenne, Wyoming, on April 16, 2009, was found to be normal. This Panel finds that Dr. Cesko's indication of neurologic damage is totally unsupported by the evidence.

This Medical Hearing Panel finds that Dr. Cesko has provided incorrect, misleading, and unsupported representations to the Wyoming Workers' Safety and Compensation Division about the nature and pathology of Mr. Beall's injury. Dr. Cesko also erroneously relied on the subjective, inaccurate, and incomplete history that had been provided to him by Mr. Beall without qualification or question. Dr. Cesko's let-

ter to the Division was based on incorrect information that was not supported by any of the medical studies, and prompted a cascade of unwarranted and unnecessary medical care that ultimately resulted in the orchiectomy surgery.

(Emphasis in original.) Mr. Beall fails to assert any grounds for rejecting these findings.

[¶ 38] We find no reason in the record to depart from the credibility findings of the Medical Commission or to conclude that they are clearly contrary to the overwhelming weight of the evidence. Mr. Beall provides no response to the main credibility issues identified by the Commission. Rather, as discussed above, he simply ignores the major part of the Commission's thirty-one-page order, which focused on the misleading statements and incomplete medical histories Mr. Beall supplied to a succession of treatment providers, Mr. Beall's evasive testimony at the contested case hearing, and the unsupported opinions of Dr. Cesko. The Commission's credibility determinations are corroborated by the record, and we find substantial evidence to support those determinations.

[¶ 39] The burden of proving that the orchiectomy was reasonable and necessary medical care as related to his October 13, 2008 workplace injury rested with Mr. Beall, and substantial evidence supports the Commission's determination that Mr. Beall failed to meet this burden.

[¶ 40] Affirmed.